# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
### 3:06cv248

| | | |
|---|---|---|
| ALDEN JEROME HARDEN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| Vs. | ) | ORDER |
| | ) | |
| GERALD BRANKER, Warden, | ) | |
| Central Prison, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

This matter is before the court on Petitioner's Petition for Writ of Habeas Corpus and supporting memorandum [docket no. 1], filed on June 13, 2006, and on Respondent's motion for summary judgment and response to Petition for Writ of Habeas Corpus [docket no. 24], filed on August 14, 2007. Petitioner filed a response to the motion for summary judgment on July 21, 2011 [docket no. 91]. On August 26, 2011, Respondent filed a Reply brief [docket no. 94]. On September 9, 2011, Petitioner filed a Surreply.

Upon review of the record, the arguments, and applicable authorities, the court will grant Respondent's motion for summary judgment and dismiss Petitioner's Section 2254 petition for writ of habeas corpus.

-1-

## PROCEDURAL HISTORY

### 1.     Trial and Sentencing

On October 18, 1993, Petitioner Alden Jerome Harden was indicted for the October 5, 1993, first-degree murders of Charlotte-Mecklenburg Police Officers Anthony A. Nobles and John T. Burnette.   The case was capitally tried in Mecklenburg County Superior Court, the Honorable Chase B. Saunders presiding. A jury found Petitioner guilty of both counts of first-degree murder on the theory of premeditation and deliberation.

On Petitioner's appeal, the North Carolina Supreme Court summarized the evidence as follows:

> The State's evidence tended to show inter alia that on 5 October 1993, defendant shot and killed two Charlotte police officers, Anthony A. Nobles and John T. Burnette, who were attempting to apprehend him. The State called thirty-four witnesses during the guilt/innocence phase of the trial. Detailed testimony was presented tending to show that defendant began the day by stealing a green Ford Aerostar van from a local hotel. Defendant then robbed Rolfe Sukkert of his wallet, threatening to injure him or Sukkert's six-month-old grandson. Defendant next proceeded to assault and rob Charles Cook at another hotel. Officers Nobles and Burnette spotted a vehicle fitting the description and license tag of the stolen Aerostar van and requested "back-up" by radio. Witnesses testified that they saw the officers chase and tackle defendant and heard shots being fired. A five-year-old eyewitness testified that he saw defendant fighting with the officers on the ground, and then he saw defendant shoot the officers. Another witness testified that after hearing gunshots, she saw defendant walking out of the woods and heard him state, "Two down, two down."

Case 3:06-cv-00248-MOC   Document 98   Filed 09/30/11   Page 2 of 49

Defendant testified on his own behalf and admitted that he shot the two police officers, but stated that he did so only because he believed that the officers intended to shoot him. Defendant testified he then left the scene and hid under a tree for approximately four hours. When he left his hiding place, he was spotted by other officers searching for him. Defendant was pursued, apprehended, and taken into custody. Defendant gave a statement to the police, detailing events leading up to and including the shootings.

*State v. Harden*, 344 N.C. 542, 550-51, 476 S.E.2d 658, 661-62 (1996).

At Petitioner's sentencing proceeding, four statutory aggravating circumstances were submitted to the jury for its consideration: (1) whether Petitioner had been previously convicted of a felony involving the use of violence to the person, N.C. GEN. STAT. § 15A-2000(e)(3); (2) whether the murder was committed for the purpose of avoiding/preventing a lawful arrest, N.C. GEN. STAT. § 15A-2000(e)(4); (3) whether the murder was committed against a Charlotte police officer while engaged in the performance of his official duties, N.C. GEN. STAT. § 15A-2000(e)(8); and (4) whether the murder was part of a course of conduct in which Petitioner engaged and whether that course of conduct included the commission by Petitioner of other crimes of violence against another person or persons, N.C. GEN. STAT. § 15A-2000(e)(11). The jury found all four aggravating circumstances in each case.

At Petitioner's sentencing proceeding, for each count of first-degree murder, two statutory, and twenty-five nonstatutory circumstances in mitigation were submitted to the jury for its consideration, as well as the "catch-all" circumstances.

-3-

In each case, the jury found, as a statutory mitigating circumstance, that Petitioner committed the offenses while he was under the influence of a mental or emotional disturbance, N.C. GEN. STAT. § 15A-2000(f)(2). In each case, the jury rejected the statutory mitigating circumstance that, at the time of the offenses, Petitioner's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was impaired, N.C. GEN. STAT. § 15A-2000(f)(6). In each case, the jury also rejected the "catch-all" mitigating circumstance contained in N.C. GEN. STAT. § 15A-2000(f)(9) (any other circumstance arising from the evidence which the jury deems to have mitigating value).

In each case, the jury found the following, seventeen non-statutory mitigating circumstances: (1) that Petitioner was a recovering drug addict who voluntarily sought detoxification and treatment and who attended Alcoholics Anonymous and Narcotics Anonymous meetings and attempted to abstain from using crack cocaine, a highly addictive substance; (2) that Petitioner was gainfully employed during most of his adult life; (3) that, notwithstanding a low average intelligence, Petitioner attended school regularly, graduating from Myers Park High School and attending Johnson C. Smith University until his father's illness forced him to drop out and help his family; (4) that Petitioner made an extra effort to be a good hotel maintenance employee by attending heating and air conditioning classes at Central Piedmont Community

-4-

College; (5) that Petitioner was affected by his father's mental illness; (6) that Petitioner was affected by the death of his father, which occurred five weeks before October 5, 1993; (7) that Petitioner's emotional reaction to the sudden and unexpected loss of his father prompted a recurrence of heavy abuse of crack cocaine; (8) that Petitioner offered nothing but "passive resistance" to police in the early morning hours of October 6, 1993, when he was apprehended in the woods; (9) that Petitioner confessed to police investigator Lisa Mangum shortly after his arrest; (10) that Petitioner has expressed remorse for having killed officers Nobles and Burnette, as well as concern and sorrow for the loss he has caused to their families; (11) that Petitioner assisted in the search for the weapon in order to protect innocent persons from death or serious bodily injury; (12) that Petitioner has been a compliant prisoner since his arrest, assisting in the jail by volunteering to sweep and mop floors and serve food to inmates; (13) that Petitioner will adapt well in a prison environment; (14) that Petitioner warned his sister Tammy and her friends of the dangers of cocaine abuse; (15) that the rebound effect of cocaine contributed to Petitioner's increased use of the drug; (16) that Petitioner voluntarily admitted himself to the Carolinas Medical Center for Mental Health in November 1992 for treatment; and (17) that Petitioner was a good friend to the family of Mary Howard, taking his lunch hour to drive Mrs. Howard and her children to doctor appointments.

-5-

In each case, the jury rejected the following eight, non-statutory mitigating circumstances: (1) that Petitioner has been a loving and supportive father to his daughter, Tondra, contributing to her financial support and emotional well-being; (2) that Petitioner has voluntarily undertaken to care for the parents of Rachel Harrell by performing household chores, transportation, and home maintenance; (3) that Petitioner was a supportive father figure to Rachel Harrell's son, James, and volunteered to serve as an assistant coach to James' Grace Methodist Church machine pitch baseball team; (4) that Petitioner was, in the months before October 5, 1993, living with his parents, assisting them at home and financially; (5) that Petitioner comes from a loving and supportive family; (6) that Petitioner did not possess a firearm on October 5, 1993, before the shootings; (7) that Petitioner was raised in a religious environment; and (8) that Petitioner contributed to the emotional development and financial support of Shante Watson, his stepdaughter.

The jury recommended that Petitioner be sentenced to death, and judgment was entered on August 12, 1994, sentencing Petitioner to death for each first-degree murder conviction. On direct appeal, the North Carolina Supreme Court found no error in the trial by unanimous decision. *State v. Harden*, 344 N.C. 542, 476 S.E.2d 658 (1996). On March 24, 1997, the U.S. Supreme Court denied certiorari. *Harden v. North Carolina*, 520 U.S. 1147 (1997).

-6-

## 2. State Court Post-Conviction Proceedings

Petitioner filed his original Motion for Appropriate Relief, dated February 12, 1998, in which he raised 12 claims. Petitioner filed three subsequent amendments to the MAR. By order dated June 25, 1999, the state MAR court procedurally barred certain claims, denied certain claims on the merits, and allowed an evidentiary hearing on the remaining claims. An evidentiary hearing on the remaining claims was conducted on December 14, 2004, through December 16, 2004. By order filed on May 26, 2005, the state MAR court denied the MAR. On May 4, 2006, the state supreme court denied certiorari. *State v. Harden*, 360 N.C. 487, 632 S.E.2d 763 (2006).

## 3. Procedural Background Post-Petition for Writ of Habeas Corpus

On June 13, 2006, Harden, through attorneys Edwin L. West, III, and Nora Henry Hargrove, filed his Petition for Writ of Habeas Corpus ("PWHC") with this court. On August 14, 2007, the State filed its Answer to the PWHC and Motion for Summary Judgment. By Order filed April 7, 2008, West and Hargrove were allowed to withdraw from the case, and the court appointed substitute counsel Kenneth Rose and David Weiss of the Center for Death Penalty Litigation. On August 6, 2008, through counsel Rose and Weiss, Petitioner filed a motion to expand the record, and moved to place the briefing schedule in abeyance. By Order filed August 8, 2008, the

-7-

briefing schedule was placed in abeyance, and the State was ordered to respond to the motion to expand the record. On August 11, 2008, Petitioner filed a second motion to expand the record. On August 15, 2008, Petitioner moved for leave to amend his PWHC. The State subsequently filed its responses to the motions to expand the record and the motion to amend the PWHC, and on January 12, 2009, Petitioner filed his reply to the State's responses.

On or about February 19, 2009, Petitioner filed a successive motion for appropriate relief in the state court. On February 27, 2009, Petitioner moved this court to hold proceedings in abeyance pending a ruling on his successive motion for appropriate relief. On September 10, 2009, the court denied the motion to hold the PWHC in abeyance. On September 7, 2010, the court allowed in part, and denied in part, Petitioner's first motion to amend the record, denied his motion to amend his PWHC, and denied the second motion to amend the record.

On September 30, 2010, Petitioner filed a motion for abeyance of proceedings pending exhaustion of claims filed under the recently enacted North Carolina Racial Justice Act or, alternatively, to establish a briefing schedule. On March 23, 2011, the court denied the motion for abeyance and ordered Petitioner to respond to the State's Answer and Motion for Summary Judgment. On July 21, 2011, Petitioner filed a response to the motion for summary judgment. On August 26, 2011, Respondent filed

-8-

a reply brief.  On September 9, 2011, Petitioner filed a Surreply.

## ANALYSIS

**1.**     **Summary Judgment Standard of Review under AEDPA**

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); *Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 913 (4th Cir. 1997). The party seeking summary judgment bears the burden of initially coming forward and demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate that there is a genuine issue of material fact which requires trial.  *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a fact-finder to return a verdict for that party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 817 (4th Cir. 1995).  Thus, the moving party can bear his burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish his claim.  *Celotex Corp.*, 477 U.S. at 331 (Brennan, J., dissenting).  When making the summary judgment determination the court must view the evidence, and all justifiable inferences from the

evidence, in the light most favorable to the non-moving party. *Zahodnick*, 135 F.3d at 913; *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th Cir. 1997).

It is too glib, however, simply to say that the standard formulation for assessing summary judgment in the run-of-the-mill civil case applies in all habeas cases. For example, the usual summary judgment analysis contemplates accepting the evidence and all justifiable inferences from the evidence in the light most favorable to the non-movant. In the habeas context, however, if there is a contention that the evidence at trial does not support the underlying conviction, the appropriate standard calls for viewing the evidence in the light most favorable to the prosecution and according the prosecution the benefit of all reasonable inferences from the evidence and, in that light, determining if any rational trier of fact could have found the petitioner guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

By way of another example, in a habeas claim of ineffective assistance of counsel, a federal court "must indulge a strong presumption that counsel's conduct was reasonable, and . . . the petitioner must overcome the presumption that the challenged conduct may have been sound trial strategy." *Strickland v. Washington*, 466 U.S. 668, 689 (1984). Nevertheless, the point is that habeas cases are subject to a summary judgment analysis as are all civil cases. *See* Rule 11, Rules Governing Section 2254 Cases In The United States District Courts; *see also Maynard v. Dixon*,

943 F.2d 407, 412-13 (4th Cir. 1991).

Furthermore, because Petitioner filed his federal habeas petition after the April 24, 1996, enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the AEDPA amendments to 28 U.S.C. § 2254 apply. Under the AEDPA amendments, no habeas application by a state court prisoner may be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). In addition, factual determinations made by a state court are afforded a presumption of correctness. *See* 28 U.S.C. § 2254(e)(1).

Section 2254 precludes *de novo* federal habeas corpus review of state court decisions on the merits of a petitioner's claim. *Bell v. Jarvis*, 236 F.3d 149,159-60 (4th Cir. 2000) (en banc)  (overruling *Cardwell v. Greene*, 152 F.3d 331, 339 (4th Cir. 1998)).  When faced with a state court decision that does not explicitly cite or apply federal law, the habeas court should conduct an "independent examination of the record and the clearly established Supreme Court law."  *Bell*, 236 F.3d at 158.

-11-

Nevertheless, the habeas court must still confine its review to whether the "result" of the state court decision "is legally or factually unreasonable." *Id*. at 163 (quoting *Aycox v. Lytle*, 196 F.3d 1174, 1178 (10th Cir. 1999)); *see also Early v. Packer*, 537 U.S. 3, 8 (2002) ("Avoiding these pitfalls does not require citation of our cases-- indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the *result* of the state-court decision contradicts them.") (first emphasis in original, second emphasis added).

A state court decision is contrary to Supreme Court precedent if it arrives at a conclusion opposite that of the Supreme Court on a question of law or decides the case differently from Supreme Court precedent based on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court decision is an unreasonable application of Supreme Court law "when a state-court decision unreasonably applies the law of [the Supreme] Court to the facts of a prisoner's case." *Id.* at 409. The "unreasonable application" standard does not admit of easy definition. For example, Justice O'Connor, writing for a majority of the Court, has said that "[t]he term 'unreasonable' is no doubt difficult to define." *Williams*, 529 U.S. at 410. Nevertheless, the Supreme Court has said that the

> unreasonable application prong of § 2254(d)(1) permits a federal habeas court to grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that

-12-

principle to the facts of petitioner's case. In other words, a federal court may grant relief when a state court has misapplied a governing legal principle to a set of facts different from those of the case in which the principle was announced. In order for a federal court to find a state court's application of our precedent unreasonable, the state court's decision must have been more than incorrect or erroneous. The state court's application must have been objectively unreasonable.

*Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (citations omitted); *see also Penry v. Johnson*, 532 U.S. 782, 793 (2001) (stating that even if the habeas court determines that the state court decision applied federal law incorrectly, relief is only appropriate if the application was also objectively unreasonable); *Williams*, 529 U.S. at 410 (stating that an *unreasonable* application of federal law is different from an *incorrect* application of federal law); *see also Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."). Finally, even if the state court's adjudication is contrary to or an unreasonable application of Supreme Court precedent, a federal habeas court may not grant relief unless the constitutional error "had substantial and injurious effect or influence in determining the jury's verdict." *Penry*, 532 U.S. at 795 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). These standards will guide the analysis below.

## 2.   Petitioner's Claims

Petitioner raises the following nine claims for relief in his habeas petition: (I) the State violated its constitutional duty to disclose evidence of witness Frank Pete's evolving statements and his inability to identify Petitioner as the perpetrator of the homicides; (II) the State allowed false evidence to go uncorrected during the voir dire of Frank Pate, in violation of the Sixth and Fourteenth Amendments to the United States Constitution; (III) a juror's consultation of the Bible during sentencing deliberations constituted consideration of prejudicial extraneous information, thereby depriving Petitioner of his constitutional rights and entitling him to a new trial; (IV) the failure of juror Williams to honestly answer a material question on voir dire and a correct response would have provided a valid basis for challenge for cause; (V) Petitioner's right to a fair trial was violated because the courtroom was packed with armed, uniformed police officers and spectators wearing yellow ribbons, all of which created an intimidating, tense atmosphere inside the courtroom; (VI) Petitioner's right to be tried by a jury selected without regard to race was violated by the State's discriminatory use of peremptory challenges against potential jurors of African-American descent; (VII) the trial court lacked jurisdiction to try Petitioner capitally because the indictment on which he was arraigned failed to allege all of the elements of first-degree murder or any aggravating circumstances that would make him eligible

-14-

for the death penalty; (VIII) the trial court's instructions and issue number three of the sentencing form placed Petitioner in jeopardy of his life if the jury determined that the mitigation was insufficient to outweigh the aggravation, violating the Eighth and Fourteenth Amendments to the United States Constitution; and (IX) the jury returned the death sentences under the influence of passion, prejudice, and other arbitrary factors.

As noted, Respondent filed a motion for summary judgment as to all of Petitioner's claims on August 14, 2007. In his response to the motion for summary judgment, Petitioner asserts arguments opposing Respondent's summary judgment motion as to only Claims V and VI. With regard to the remaining seven claims, Petitioner states in his response brief that he "reasserts the arguments made in his petition." (Petitioner's Response Br., p.1.)

Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Because Petitioner has not attempted to contest Respondent's motion for summary judgment as to Claims I, II, III, IV, VII, VIII, and IX, the court will deem those claims to be abandoned. In any

event, the court has carefully considered the arguments in Respondent's brief and agrees with Respondent that Petitioner has no right to relief as to these seven claims. Thus, the court will grant summary judgment to Respondent as to Claims I, II, III, IV, VII, VIII, and IX based on the reasons articulated in Respondent's brief in support of its motion for summary judgment.

### A. Claim V

In Claim V of his PWHC, Petitioner contends that his right to a fair trial was violated because the courtroom was packed with armed, uniformed police officers, creating an intimidating, tense atmosphere inside the courtroom.[1] *See Holbrook v. Flynn*, 475 U.S. 560 (1986).[1] Petitioner raised this claim in his First Amended MAR, and the MAR court denied the claim. Petitioner contends that the state MAR court's ruling was contrary to or an unreasonable application of clearly established Supreme

----

[1] Petitioner also claims in his PWHC that he was denied the right to a fair trial because spectators wearing yellow ribbons were also in the courtroom during Petitioner's trial. In Respondent's summary judgment brief, Respondent states that there was no testimony at the post-conviction hearing to establish that any person in the courtroom wore a yellow ribbon. Petitioner notes in his response to the summary judgment motion that he "now focuses this claim on the presence of the officers and the effect they had in the context of all the circumstances surrounding his trial." (Petitioner Resp. Br., p. 48 n.28, docket no. 91.) Therefore, this court does not address arguments that Petitioner makes in his petition or arguments he made in the state court post-conviction proceedings that he was denied the right to a fair trial because spectators were wearing yellow ribbons at the trial.

[1] In *Flynn*, the Supreme Court addressed whether the presence of uniformed officers at the defendant's trial inherently prejudiced the defendant. The Court held that, under the circumstances, the defendant was not prejudiced by the presence of the officers. *Flynn*, 475 U.S. at 572.

-16-

Court.  For the following reasons, the court does not agree.

### 1.    The Trial Court and State MAR Court Proceedings

Before trial, the defense sought a ruling by the trial judge to exclude from the courtroom uniformed officers other than those employed for security.  The trial court denied the ruling.  In his First Amended MAR, Petitioner contended that the presence of uniformed officers as spectators at his trial created an "inherently prejudicial atmosphere," which denied him of his right to a fair trial.  Petitioner claimed to the court that there were as many 100 uniformed officers regularly in attendance at his trial.  (First Am. MAR, p. 22) (Ex. G.)  The MAR court held a two-and-a-half day post-conviction evidentiary hearing on this claim, in which numerous witnesses were called to testify in connection with the claim.

Petitioner's trial attorneys Lawson and Frazier as well as three jurors all testified at the post-conviction hearing.  Frazier testified that to his recollection "there were large numbers of uniformed police officers allowed to observe the trial."  (MAR T. p. 281.) (Ex. L.)  At another time in the hearing, Frazier testified that there were more than fifty officers in the courtroom.  (*Id*. p. 283.)  Frazier testified that "[a]t all points in time, [the officers] were highly professional."  (*Id*. p. 284.)  Frazier also identified a post-conviction affidavit signed by him on February 12, 1998, around three-and-a-half years after the trial, pursuant to which he had stated that "[a]t certain

-17-

key points in the trial, such as closing arguments and sentencing arguments, there were as many as one hundred uniformed officers in the courtroom, as well as officers outside the courtroom who were unable to fit in."[2] (*Id*. p. 287.) When asked on cross-examination, however, about the specific number of police officers in the courtroom, Frazier responded, "[W]ith all due respect, I am at the criminal defense table looking at the Judge, looking at the jury, and trying to concentrate on what is in front of me. So I wasn't making a head count. I am just giving you my best estimate." (*Id*. p. 299.)

Petitioner's first chair Jean Lawson testified that she had made a point to notice the number of uniformed police officers in the courtroom with a view toward making a proffer for the record in order to preserve the issue for appeal. (*Id*. p. 487.) Lawson testified that if there had been an excessive number of officers in the courtroom she would have made a proffer for the record at that time. (*Id*. p. 487-88.) Lawson recalled that uniformed officers who testified at the trial remained in the courtroom for brief periods of time until the next recess, but that she did not recall a significant numbers of uniformed officers who came to observe, or otherwise she would have

---

[2] Frazier testified additionally that members of a citizens' organization had worn yellow ribbons. As noted, Petitioner has stated that he is not pursuing his claim based on any persons in the courtroom wearing yellow ribbons, and the state MAR court further found no evidence of yellow ribbons. Therefore, the court will not address Frazier's testimony regarding persons in the courtroom wearing yellow ribbons.

-18-

raised the issue to the trial judge.  (*Id*. pp. 488-89.)  Lawson estimated that, on any given day, there were no more than ten to fifteen uniformed officers in the courtroom. (*Id*. p. 489) ("[c]ertainly not the numbers that Ms. Williams talks about in her affidavit, nor what I understand Butch Frazier had said.").

Lawson further stated that the police department itself was instrumental in limiting the number of officers during the trial, and that she was actually disappointed because she had hoped to make an issue out of it.  (*Id*. p. 489.)  Lawson testified that she did not, however, have that opportunity, and that, of the officers who were present during the trial, she observed neither conduct that would have caused her concern regarding the fairness of the trial, nor any show of force or intimidation to the jury. (*Id*. p. 490.)  Lawson testified that if she had seen any inappropriate conduct by the officers, she would have brought the matter to the attention of the trial judge.

Three jurors also testified at the post-conviction hearing.  Former juror John K. Green, the foreman of Petitioner's jury, testified that he noticed a few uniformed officers in the courtroom, and that he was surprised that there were not more.  Green testified that, on an average day, he observed four or five uniformed officers in the courtroom.  (*Id*. p. 368.)  Green stated that nothing about their conduct indicated that they were present for any purpose other than as spectators.  (*Id.*)  Green testified that the officers did not engage in any display or show of force, did not attempt to

-19-

communicate with the jury, and did not conduct themselves in any manner so as to cause Green to feel intimidated. (*Id*. pp. 368-69.) Furthermore, no other member of the jury mentioned anything to Green about feeling "intimidated" by the officers' presence and, in fact, he did not believe that anyone even noticed them. (*Id*. p. 372.) He did not recall whether, after testifying, the officers involved in the case left the courtroom or remained to observe. (*Id*. p. 374.)

Juror Elizabeth Williams also testified at the post-conviction hearing. Williams testified that the uniformed officers who attended the trial appeared to be there as spectators, and that they did nothing to try to communicate any message to the jury or to influence the jury. She did not feel intimidated by the officers' presence. (*Id*. pp. 179-80.) Williams testified that during the trial her attention was focused on the evidence, the witnesses, and on what she was hearing, and she did not really even care what was going on in the gallery.[3] (*Id*. p. 180.)

Juror Gail Hamner also testified in the post-conviction hearing. Hamner testified that her focus was not on the audience at trial, but she estimated five to ten uniformed officers were in the courtroom on any given day. Hamner testified that the

---

[3] Respondent notes that Williams had signed a post-conviction affidavit that had been prepared by the defense, stating, among other things, "During the trial I never saw so many deputies and police as I saw in the courtroom[.]" (MAR T. p. 166.) At the post-conviction hearing, however, on cross-examination by the State, Williams testified that she "must not have read [the post-conviction affidavits signed by her] thoroughly." (MAR T. pp. 183-84.) She testified in her post-conviction affidavits for the defense that "they have turned stuff around. They turned my words around, and I just didn't read them properly." (MAR T. pp. 189.)

officers usually sat in the back of the courtroom and that their presence did not cause her to feel either intimidated or that the officers were trying to communicate a message to the jury. (*Id*. pp. 251-52.) Rather, the officers appeared to be there as spectators only. (*Id*. p. 252.)

Former prosecutor Thomas Porter, one of the prosecutors at Petitioner's trial, testified that he recalled seeing around four or five uniformed officers in the courtroom on a regular basis. (*Id*. pp. 382-83.) He did not observe any attempt to communicate with the jury, or conduct that would communicate a demonstration of force. (*Id*. p. 383.) Porter testified that the State was sensitive about this issue because they did not want to do anything that would adversely affect the case. (*Id*. pp. 383-84.) Therefore, the prosecution instructed their investigator to tell the police officers who wished to attend the trial not to wear their uniforms; if they wanted to come, to come in civilian clothes. (*Id*. p. 398.)

Marvin Terrell Jeffcoat, chief investigator at the Mecklenburg County Public Defender's Office, also testified at the post-conviction hearing. Jeffcoat testified that he observed armed, uniformed officers in the courtroom during the trial, and he estimated their number to be thirty-five to fifty. He did not actually count the number of police officers, but he estimated that "at least one-third" of the audience were armed, uniformed police officers. (*Id*. pp. 326-34.)

-21-

After the post-conviction hearing, the state MAR court denied Petitioner's claim on the merits. The state MAR court concluded as a matter of law that Petitioner failed to show a violation of his right to a fair trial on the ground of inherent prejudice. (MAR Order, p. 12, Conclusion of Law No. 1.) (Ex. M.) The MAR court further specifically found as a fact that "[t]he uniformed and armed officers in the audience at the defendant's trial were not excessive in number." (*Id*. p. 11.)

## 2. Clearly Established Supreme Court Law Regarding Courtroom Practices and a Defendant's Right to a Fair Trial

Here, the United States Supreme Court has clearly recognized that certain courtroom practices "are so inherently prejudicial that they deprive the defendant of a fair trial." *Carey v. Musladin*, 549 U.S. 70, 72 (2006) (citing *Estelle v. Williams*, 425 U.S. 501, 503-06 (1976)). Specifically, the Court has held that the presence of spectators at a trial, in the absence of state-sponsored courtroom practice, results in no inherent prejudice to a criminal defendant unless the non-state-sponsored courtroom practice amounts to "mob domination" such as would interfere with the course of justice or violate a defendant's right to due process of the law.[4] *See Moore v. Dempsey*, 261 U.S. 86, 90-91 (1923) (concluding that the citizens' threats of mob

---

[4] Respondent notes that Petitioner raise the issue of venue on direct appeal, and it was rejected. *See State v. Harden*, 344 N.C. 542, 552-53, 476 S.E.2d 658, 662-63 (1996). Petitioner has not asserted a venue claim as a grounds for issuing his writ of habeas corpus.

violence controlled the verdict).

The Supreme Court most recently addressed spectator conduct at trial in *Carey v. Musladin*. 549 U.S. at 72. In *Musladin*, the victim's family wore buttons with the victim's photo on them during the petitioner's state court trial. *Id.* The petitioner argued in his petition for writ of habeas corpus that the family's wearing of the buttons deprived him of his Fourteenth and Sixth Amendment rights to a fair trial because the buttons were inherently prejudicial. *Id.* at 73. The district court denied the petition, but granted a certificate of appealability on the buttons issue.

The Ninth Circuit Court of Appeals reversed and remanded for issuance of the writ, determining that the Supreme Court decisions in *Holbrook v. Flynn*, 475 U.S. 560 (1986) and *Estelle v. Williams*, 425 U.S. 501 (1976), had clearly established a rule of federal law applicable to Musladin's case.[5] *Musladin v. Lamarque*, 427 F.3d 653, 656-658 (2005). The Ninth Circuit held that the state court's application of a test for inherent prejudice that differed from the one stated in *Williams* and *Flynn* "was contrary to clearly established federal law and constituted an unreasonable application of that law." 427 F.3d at 659-60.

---

[5] In *Williams*, the Court considered "whether an accused who is compelled to wear identifiable prison clothing at his trial by a jury is denied due process or equal protection of the laws." 425 U.S. at 502. In *Flynn*, the Court addressed whether seating "four uniformed state troopers" in the row of spectators' seats immediately behind the defendant at trial denied the defendant his right to a fair trial. 475 U.S. at 562. The Court held that the presence of the troopers was not so inherently prejudicial that it denied the defendant a fair trial. *Id.* at 571.

-23-

The Supreme Court vacated the Ninth Circuit's decision, rejecting the Ninth Circuit's reliance on *Williams* and *Flynn* as clearly established Supreme Court law applicable to the petitioner. The Supreme Court noted that *Williams* and *Flynn* had "dealt with government-sponsored practices," as opposed to merely "spectator conduct," which was the issue at the petitioner's trial. *Musladin*, 549 U.S. at 76. The Court observed that the effect of spectator conduct on a defendant's right to a fair trial "is an open question in our jurisprudence," further noting that "[t]his court has never addressed a claim that such private-actor courtroom conduct was so inherently prejudicial that it deprived a defendant of a fair trial." *Id*. at 76. The Court concluded that "[g]iven the lack of holdings from this Court regarding the potentially prejudicial effect of spectators' courtroom conduct of the kind involved here, it cannot be said that the state court 'unreasonably applied clearly established Federal law.'" *Id*. at 77 (alterations omitted) (citing 28 U.S.C. § 2254(d)(1)).

Here, as in *Musladin*, there was no state-sponsored courtroom procedure. It is true that the citizen-spectators in this case were armed and were attired in police uniforms. Under the very narrow AEDPA standard of review, however, this court cannot grant the petition unless the state MAR court's decision was contrary to or an unreasonable application of *clearly established* Supreme Court law. Because the Supreme Court law regarding the effect of spectators on a defendant's right to a fair

trial is not clearly established, the state MAR court's decision was neither contrary to nor an unreasonable application of Supreme Court law.

Furthermore, the record evidence amply supports the state MAR court's finding of fact that the number of uniformed and armed officers in the audience at Petitioner's trial was not excessive. (MAR Order, p. 11, ¶ 38) (Ex. M.) The state MAR court's factual finding is first supported by Jean Lawson's testimony that, throughout the trial, she was noting the attendance of the police for the purpose of recognizing, identifying, and preserving any issue arising out of police attendance at trial, and that neither the number of police officers, nor the conduct of the police officers, had formed a basis for a claim of error or prejudice by the defense. The state MAR court's finding is further supported by the testimony of the jurors who testified at the post-conviction hearing that neither the officers' presence nor their conduct substantially intimidated or otherwise made any significant impression on the jurors. The state MAR court made its findings after a two-and-a-half day evidentiary hearing, during which the MAR judge had the opportunity to observe the demeanor of the numerous witnesses who testified to assess their credibility. Here, Petitioner has failed to rebut, by clear and convincing evidence, the factual findings of the state MAR court. 28 U.S.C. § 2254(e)(1). Petitioner has further failed to show that the state MAR court's ruling was based on an unreasonable determination of the facts "in light of the evidence presented

-25-

in the State court proceeding." 28 U.S.C. § 2254(d)(2).

The court notes that Petitioner contends that the state MAR court's failure to make a factual finding as to the precise number of police officers in the courtroom warrants an evidentiary hearing on the matter. The court will not grant Petitioner's request for an evidentiary hearing. It would have been impossible for the state MAR court to make a factual finding regarding the number of police officers in the courtroom, as the testimony demonstrates that the numbers fluctuated at any given time during the trial. It was sufficient for the state MAR court to find as fact that the actual numbers of uniformed officers at any given time was not excessive and, as noted, the evidence amply supports this finding.

Petitioner also contends that the state MAR court erred by considering juror testimony and in failing to consider the circumstances of Petitioner's trial in determining his claim. Petitioner cites to *Tanner v. United States*, 483 U.S. 107 (1987), in support of his argument that the state MAR court erroneously considered juror testimony in rejecting Petitioner's claim that he was denied a fair trial as a result of the presence of uniformed officers in the courtroom during Petitioner's trial. *Tanner* and its progeny generally prohibit, in accordance with Rule 606(b) of the Federal Rules of Evidence, the use of juror testimony to impeach a verdict. Rule 606(b) asserts the well-established principle that a juror may testify to the fact that an

-26-

extraneous influence was brought to the jury's attention, but the juror may not testify as to the effects of the extraneous influence on the jury's deliberative influences.[6] *See Tanner*, 483 U.S. at 121.   Petitioner contends that the state MAR court violated *Tanner* and its progeny by considering the testimony of several jurors in order to determine whether Petitioner was prejudiced by the fact that uniformed officers were in the courtroom as spectators during Petitioner's trial.

As Respondent notes, Petitioner's uniformed officers claim is not a Rule 606(b) claim and, therefore, *Tanner* does not apply to Petitioner's case.   Even if Rule 606(b) applied, however, the jurors could properly testify as to the *existence* of the officers in the courtroom.   Thus, the state MAR court's reliance on testimony from jurors as to how many officers were in the courtroom during Petitioner's trial did not violate

---

[6] Rule 606(b) states:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith.   But a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jury's attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict onto the verdict form. A juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be precluded from testifying.

FED. R. EVID. 606(b).

Rule 606(b). Nor did the state MAR court's consideration of the jury testimony violate *Holbrook v. Flynn*. 475 U.S. 560. As Respondents note, the determinative issue here was an issue of fact–whether the number of officers was excessive. In *Flynn*, by contrast, the number of officers in the courtroom was not at issue. *See Flynn*, 475 U.S. at 570. Rather, in *Flynn*, the issue was whether the state-sponsored presence of *four* uniformed state troopers resulted in inherent prejudice to the defendant. *Id*. at 570. In determining the issue of inherent prejudice, the state trial court in *Flynn* considered the jurors' assurances *before trial* that they would not be prejudiced by the officers' presence. *Id*. at 565. The U.S. Supreme Court ultimately disapproved of the trial court's consideration of the jurors' assurances, noting that "jurors will not necessarily be fully conscious of the effect it will have on their attitude toward an accused." *Id*. at 570. Thus, the Supreme Court disapproved of questioning jurors *before trial* as to whether they were likely to be prejudiced by a specific courtroom practice. *See id*. By contrast, in this case, the juror testimony was admitted *after trial* on an issue of fact relevant to Petitioner's allegation that there were as many as 100 uniformed officers regularly in attendance at Petitioner's trial. The state MAR court properly considered juror testimony as to this factual issue. Furthermore, the state MAR court found, as a fact, that the uniformed officers who sat as spectators at Petitioner's trial were not excessive in number and, based on that

-28-

factual finding, concluded as a matter of law that there was no inherent prejudice. Any testimony by the jurors as to their deliberative processes was therefore irrelevant and harmless.[7]

Petitioner also contends that the state MAR court erred in denying his uniformed officers claim by failing to consider the "totality of the circumstances" surrounding Petitioner's trial. Here, Petitioner is apparently referring to the pre-trial publicity in his case. Petitioner is merely attempting to reassert his change of venue claim in this court, despite that the court denied Petitioner's motion to amend his PWHC to add a change of venue of claim. In sum, Petitioner's "totality of the circumstances" claim is without merit. To conclude, the state MAR court's consideration of juror testimony in addressing Petitioner's fair trial claim was neither contrary to nor an unreasonable application of clearly established Supreme Court law,

_____

[7] Respondent notes that the Supreme Court recently confirmed in *Harrington v. Richter* that, on federal habeas review, the reasons articulated by the state court in reaching its result are not determinative–rather, it is the result *itself* that is determinative, and the issue before the habeas court is whether that result was contrary to or an unreasonable application of clearly established Supreme Court law. 131 S. Ct. 770, 784 (2011). Respondent contends, therefore, that the state MAR court's consideration of testimony from jurors in adjudicating Petitioner's fair trial claim is not relevant to this court's determination of whether the state MAR court's adjudication was contrary to or an unreasonable application of Supreme Court law. Petitioner insists, on the other hand, that *Richter* is limited to cases involving summary state court dispositions. The court need not detain itself for long with the application of *Richter*, however, because the consideration of juror testimony by the state MAR court simply did not result in an adjudication that was contrary to or an unreasonable application of clearly established Supreme Court law.

-29-

nor was it an unreasonable determination of the facts, in light of the evidence presented in the state court proceeding.

B.    Claim VI

In Claim VI, Petitioner contends that his right to be tried by a jury selected without regard to race was violated by the State's discriminatory use of peremptory challenges against potential jurors of African-American descent.   At Petitioner's trial, the prosecutor exercised peremptory challenges to excuse from the jury Shannon Smith and Linda Stein, two black females.   Petitioner raised this claim on direct appeal to the state supreme court, and the state supreme court denied the claim.

1.    Voir Dire of Shannon Smith

During jury selection, Shannon Smith, a black female, was called as a potential juror.  The prosecutor subsequently stated his intention to peremptorily excuse her. The defense objected on *Batson* grounds, and the prosecutor offered his reasons for the challenge.   The prosecutor stated that Smith was very young; that she had indicated that her values and opinions were still in the formative stages; and that although she expressed an opinion on the death penalty, she might change her opinion during the course of evidence.  The prosecutor further explained that Smith's living arrangement was not "stable," in that she was currently living at the "Y," meaning the YWCA.

-30-

The prosecutor further explained that Smith has reported inconsistently about her knowledge of the case. For instance, in response to questioning by the trial judge, Smith stated that she had not heard anything about the case. When questioned by the prosecutor, however, Smith stated that she did know something about the case. Finally, the prosecutor noted that Smith had been late for court, and he opined that she "shows an indifference to these proceedings, which may further indicate immaturity or a lack of values being totally formed." (Red T. p. 730.)

In response to hearing the prosecutor's reasons for striking Smith, defense counsel argued that the prosecutor's reasons were pretextual. The court then ruled as follows:

> COURT: All right. Assuming arguendo that prima facie case has been made, the Court will find and conclude that the State's explanations are race neutral and will allow the challenges.

(*Id*. p. 733.)

> Subsequently the court noted for the record,

> COURT: . . . [T]he Court . . . does wish to place in the record that court, on today's date, 7/8, was delayed some twenty-four minutes before Juror Smith came, Juror Smith came into court. And further, that during the pretrial publicity inquiry, Juror Smith did indicate she had no knowledge whatsoever of what occurred, and later on professed knowledge upon subsequent inquiry.

(*Id*. pp. 777-78.)

2.      Voir Dire of Linda Stein

-31-

During jury selection, Linda Stein, also a black female, was called as a potential juror. (*Id*. p. 1538.) The prosecutor subsequently stated his intention to peremptorily excuse her. (*Id*. p. 1550.) The defense objected on *Batson* grounds, and the prosecutor offered his reasons for the challenge. The prosecutor stated that Stein had expressed reservations concerning her jury service. First, she had stated that her concern for her children could distract her if the case went on for a long time. Stein had also expressed concerns over job security and loss of income in such event. (*Id*. p. 1552.) The prosecutor further noted that, after hearing discussion and questioning of other jurors on the previous day of jury selection, Stein had failed to ask her employer how a lengthy service as a juror might affect her employment. (*Id*. pp. 1652-53.) The prosecutor expressed a concern that she might not have been paying attention on the previous day. The prosecutor stated that the fact that Stein had not asked her employer about the effect of a lengthy juror service "gives me some concern as to the seriousness with which she would be attending or listening and paying attention to the proceedings." (*Id*. p. 1553.) The prosecutor further stated, in response to questioning about the death penalty, that Stein said simply that she "d[idn't] oppose it," and he could not elicit further discussion or description from Stein as to her feelings or beliefs about the death penalty. (*Id*.) Finally, the prosecutor expressed his concern that Stein would "hold the State to a higher burden of proof than the law

-32-

requires." (*Id.*)

> PROSECUTOR: . . . When asked what type of proof the State would require, after I had very carefully said the State's burden is beyond a reasonable doubt, that had been discussed extensively yesterday in her presence with other jurors, those same types of questions had been asked, whether this juror would hold the State to a higher burden of proof than the law requires. I've asked that of everybody, jurors that–everybody questioned and questioned in her presence. She very emphatically says it would have to be absolutely, no shadow of a doubt. And I asked her if that would be different than the–if she would hold us to her own personal standard, as opposed to that by the law, when opposed by the law. She said she would. As Mr. Frazier [defense counsel] said, upon further questioning, she said she would follow the law. But I have some serious reservations about the standard of proof that this juror would require of the State, if we go into a punishment phase and the State–and the State asking the jury to return a sentence of death. I would contend by her answers, they're very strong indication that she's going to hold the State to a higher burden of proof.

(*Id.* pp. 1553-54.)

The defense did not advance an argument that the reasons were pretextual. (*Id.* p. 1554.) The trial judge noted, however, an objection by the defense, stating that he would "allow the challenge, finding the reasons to be not pretextual and race neutral." (*Id.*)

On appeal, the North Carolina Supreme Carolina found no error, stating:

> By another assignment of error, defendant contends that his right to be tried by a jury selected without regard to race was violated by the prosecutor's discriminatory use of peremptory challenges in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986).
>
> . . . .

Defendant argues that the prosecutor in this case used eight of his fourteen peremptory challenges to remove black venire members, leaving only one black juror sitting on the final jury. Defendant contends that race was a motivating factor for the prosecutor's dismissal of prospective black jurors. Defendant specifically argues that, over his objection, the trial court permitted the prosecutor to peremptorily challenge Shannon Smith and Linda Stein, both black females, for a pretextual reason.

With respect to Smith, the prosecutor offered her youth and immaturity as reasons for excusing her. The prosecutor also indicated concern about her residence (she lived at the YWCA) and her change in response regarding having knowledge about the case (she denied it at first and then said she had seen something in the paper). Based on those statements, the trial court allowed the challenges. The trial court subsequently noted in the record that Smith had been twenty-four minutes late for court that morning and that she had altered her testimony regarding exposure to pretrial publicity.

With respect to Stein, the prosecutor indicated four concerns in response to defendant's Batson motion: (1) she had small children; (2) she expressed reservations about job security and loss of income; (3) although she said she did not oppose the death penalty, the prosecutor could not get her to elaborate; and (4) the prosecutor felt that she would hold the State to a higher burden of proof than the law requires.

After careful review of the record, we conclude that the prosecutor's voir dire questioning of Smith and Stein shows that there was sufficient evidence to support the trial court's finding that the reasons proffered by the prosecutor were race-neutral. This assignment of error is therefore overruled.

*State v. Harden*, 344 N.C. 542, 557-59, 476 S.E.2d 658, 665-66 (1996).

Petitioner contends that the state court's decision was contrary to or an

unreasonable application of *Batson v. Kentucky*, 476 U.S. 79, 89 (1986), and its

-34-

progeny, including *Miller-El v. Dretke*, 545 U.S. 231, 266 (2005) (finding "unreasonable" under Section 2254(d)(2) the Texas trial court's determination that the State's race-neutral explanations for excusing black jurors were true). For the following reasons, the court does not agree.

> 3. Clearly Established Supreme Court Law with Regard to Peremptory Challenges

In *Batson v. Kentucky*, the Supreme Court held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race . . . ." 476 U.S. 79, 89 (1986). When a *Batson* claim is made, the trial court must conduct a three-part inquiry. First, the opponent of the peremptory challenge has to make out a prima facie case of discrimination in the selection of the jury. *Hernandez v. New York*, 500 U.S. 352, 358 (1991). To establish a prima facie case of discrimination, the defendant must first show that he is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove members of his race from the jury. Second, the defendant may rely on the fact that peremptory challenges by their nature permit discrimination. Third, the defendant must show that these facts and any other relevant circumstances raise an inference of discrimination by the prosecutor in the exercise of his peremptory challenges. *Batson*, 476 U.S. at 96.

-35-

If a prima facie case is made, the burden shifts to the proponent of the challenge to come forward with a race-neutral explanation for the challenge. *Id*. The explanation need not be "persuasive or even plausible" as long as it is neutral. *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (citing *Hernandez v. New York*, 500 U.S. 352 (1991)). Finally, if parts one and two are satisfied, the trial court must then decide whether the opponent of the strike has proved "purposeful discrimination." *Hernandez*, 500 U.S. at 358. While "[t]his final step involves evaluating 'the persuasiveness of the justification' proffered by the prosecutor . . . 'the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.'" *Rice v. Collins*, 546 U.S. 333, 338 (2006) (quoting *Elem*, 514 U.S. at 768).

The trial court's decision on the ultimate question of discriminatory intent in *Batson* challenges is a finding of fact that must be accorded great deference. *Hernandez v. New York*, 500 U.S. 352, 364 (1991). Furthermore, on federal habeas review of a state court decision, the state court's findings of fact are presumed to be correct. *Id*. at 366 (citing 28 U.S.C. § 2254(d)). Thus, a federal court may only grant a habeas petition "if it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge." *Collins*, 546 U.S. at 338. As the Supreme Court has explained, "[r]easonable minds reviewing the record might disagree about

the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination." *Id.* at 341-42.

Petitioner contends that the state court's decision on his *Batson* claim was contrary to the Supreme Court's ruling in *Miller-El v. Dretke*, 545 U.S. 231 (2005), in that the state court failed to conduct a comparative analysis of how the voir dire was conducted as to potential black and white jurors. Petitioner's conviction became final on March 24, 1997. *Miller-El* issued on June 13, 2005, eight years after Petitioner's case became final on direct review. Under the very narrow AEDPA standard of review, this court may not issue the writ unless the state court adjudication was contrary to Supreme Court law as it was clearly established as of the time Petitioner's conviction became final. *See Daniels v. Lee*, 316 F.3d 477, 492-93 (4th Cir. 2003); *see also Brown v. Greiner*, 409 F.3d 523, 533 (2d Cir. 2005) ("Later Supreme Court decisions play no role in assessing the reasonableness of the state court decisions."). Since *Miller-El* issued after the state court adjudication, *Miller-El* is simply not applicable to this court's analysis, as *Miller-El* was not "clearly established" federal law as determined by the Supreme Court when Petitioner's conviction became final.[8]

---

[8] In any event, even if *Miller-El* had been decided before Petitioner's conviction became final, the state court did not unreasonably apply *Miller-El*. *Miller-El* did not alter the *Batson* analysis. *See Rice v. Collins*, 546 U.S. 33 (2006) (after *Miller-El*, restating and applying the three-step *Batson* analysis). Rather, the Court in *Miller-El* simply applied the three-step analysis of *Batson* to the facts in that case and determined that the circumstances were so "exceptional" in that case that it was unreasonable for the state

-37-

The court further finds that Petitioner has failed to rebut the trial court's factual findings by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). First, as to juror Smith, the prosecutor's reasons for striking Smith are supported by statements made by Smith on voir dire. First, when the trial court judge asked Smith whether she had "read or heard anything about" the case, she stated that she had not. (Red T., p. 487.) Smith subsequently, however, admitted to the prosecutor that she in fact *had* heard about the case:

> PROSECUTOR: And, Ms. Smith, I believe you said you heard nothing about the case?
> SMITH: Not recently, when it first happened.
> PROSECUTOR: I'm sorry?
> SMITH: Last October, I knew that there were two cops killed, but after that I saw -- I saw in the paper, and I didn't think anything of it, and I went to reading something else.
> PROSECUTOR: Okay. So you do recall that you heard something back when it happened, but that's been it?
> SMITH: Yes.

(*Id*. p. 695.)

---

court to accept the prosecution's reasons for striking black jurors. Indeed, the Supreme Court noted in *Miller-El* that the "case for discrimination" there went "beyond [the exercise of peremptory challenges] comparisons to include broader patterns of practice during the jury selection." *Miller-El*, 545 U.S. at 253. The Court found that the exceptional circumstances in that case included (1) the prosecution's shuffling of the venire panel, its inquiry into views on the death penalty, and its questioning about minimum acceptable sentences and (2) the "widely known evidence of the general policy of the Dallas County District Attorney's Office to exclude black venire members from juries." *Id*.

The prosecutor subsequently asked Smith various questions regarding her feelings about the death penalty.

> PROSECUTOR: . . . Ms. Smith, could you tell me something about your views about the death penalty, ma'am.
> SMITH: Umm, I believe in the death penalty, and that's all I can really say about it.
> PROSECUTOR: Okay. Is that something that you have given some thought, discussed over a period of time?
> SMITH: I've given it some thought, and people have questioned me, have asked me do I believe in the death penalty, and I told them yes.
> PROSECUTOR: Okay. Is that anything that you've changed your mind about over a period of time, or is that just the way you've come to believe as you developed?
> SMITH: That's just the way I feel. I'm at an age where I'm developing my values and, you know, that's just one thing that I decided to go, believe in the death penalty.

(*Id*. p. 690.)

Smith stated that she was twenty-three years old; she had been working at the YWCA for seven months; she had previously worked for four years at the public library; she was currently living at the YWCA in the living quarters; she graduated from high school in 1989 and had previously attended community college; and she planned to return to community college in the fall. (*Id*. pp. 691-92.)

Here, the record supports the prosecutor's stated concerns about Smith serving as a juror. First, the fact that Smith was living temporarily at the YWCA and her tardiness in arriving at trial support the prosecutor's stated concerns about Smith's youth and immaturity as a reason for releasing her from the jury pool. The prosecutor

-39-

also stated that he was concerned that Smith's values and opinions were still in the formative stages based on her response to the prosecutor's repeated efforts to elicit her feelings on the death penalty. Finally, the prosecutor's statement that Smith had given inconsistent statements regarding her knowledge of the case is also supported by the evidence. That is, Smith first stated to the trial judge that she had not read or heard anything about the case. She later revealed that she had, in fact, read about it in the newspaper. In sum, the evidence supports the prosecutor's statements for why he struck Smith from the jury.

Next, as to Stein, when the court invited Stein to make a statement relating to hardship, Stein stated that although there was no hardship at that time, there was "a potential for it." (*Id*. p. 1539.) Stein stated that when school started on August 20, she would have to take her children to and from school. (*Id*. pp. 1539-40.) The prosecutor further asked Stein about her views on the death penalty.

> PROSECUTOR: Mrs. Stein, the employment that you have with the bank, is that a situation that you have talked with your employer about, and is that going to present any type of hardship as far as your job security or loss of income?
> STEIN: I don't know.
> PROSECUTOR: Is -- let's see. You were here yesterday. Were you here the day before, too? I can't remember. Were you here the day before, too?
> STEIN: I was here, but I don't think I made it into the courtroom.
> PROSECUTOR: Okay. After you were in here yesterday and heard Judge Saunders discussing the possible length of the case, did you attempt to contact your employer to find out if that would present any

-40-

type of hardship or -- I'm sorry, if that would present any loss of income,
or any problem with job security?
STEIN: I didn't ask at that time.

(*Id*. pp. 1541-42.)

When questioned whether she had concerns about the care of her children or

loss of income, or problems with her employment, Stein responded that she did not

"foresee it at this time." (*Id*. p. 1542.) The prosecutor then asked Stein if she would

have an "opportunity to check on that at some point," to which Stein responded,

"Yes." (*Id*.) The prosecutor also asked Stein to "tell me a little more about your

beliefs, opinions about the death penalty." (*Id*. p. 1545.) Stein answered, "I don't

oppose it." (*Id*.) Further questioning elicited nothing informative. (*Id*. pp. 1545-46.)

The prosecutor also asked Stein if she could perform her duty of imposing the death

penalty if the State met its burden. Stein responded, "As long as there was no shadow

of a doubt, I could." (*Id*. p. 1546.) The prosecutor reminded Stein that the State's

burden of proof is "beyond a reasonable doubt" and asked Stein if she "would require

a higher level of proof of the State in a case involving, potentially the death penalty."

(*Id*. pp. 1546-47.) Stein responded, "Yes." (*Id*. p. 1547.) The prosecutor then asked

Stein if she meant that the State would have to meet her personal standard of

proof–that is, "no shadow of a doubt." (*Id*.) To that question, Stein responded,

"That's correct." (*Id*.) The prosecutor then asked Stein whether that meant that she

-41-

would "follow your own standard as opposed to what the court told you?" (*Id*. pp. 1547-48.)  Stein responded "no." (*Id*. p. 1548.)

Again, the prosecutor's concerns are borne out by the record.  Stein expressed concerns about the care of her children should the trial go for a protracted period of time.  She had also neglected to consult with her employer regarding matters about which she knew or should have known she would be questioned.  She also had very little to say about her opinion on the death penalty, and she even initially told the prosecutor during questioning that she would impose her personal standard in determining whether the State had met its burden of proof.  Here, Stein's testimony supports the prosecutor's stated concern "as to the seriousness with which she would be attending or listening and paying attention to the proceedings." (*Id*. p. 1553.)

In support of his *Batson* argument, Petitioner states that the prosecutor used eight of his fourteen preemptory challenges to exclude black jurors, and that only one black juror sat on his jury.  The State's use of eight out of fourteen peremptory challenges to excuse black jurors does not in and of itself establish purposeful discrimination.  In other words, although this numerical fact may be considered, more is necessary to satisfy a defendant's burden on a *Batson* issue.  *See Miller-EL I*, 537 U.S. 322, 342 (2003) (stating that the statistical disparity "raises *some debate* as to whether the prosecution acted with a race-based reason when striking prospective

jurors") (emphasis added).

Furthermore, it is well established that *Batson* and its progeny do not require representation on the jury based on quotas. *See Batson*, 476 U.S. at 86 n.6 (stating that "it would be impossible to apply a concept of proportional representation to the petit jury in view of the heterogenous nature of our society"). Therefore, a prosecutor could peremptorily challenge every member of a particular race or gender without violating any constitutional guarantees, as long as the challenges were not impermissibly motivated. *See Hernandez*, 500 U.S. at 359-60 (noting that in conducting a *Batson* inquiry, "official action will not be held unconstitutional solely because it results in a racially disproportionate impact").

Next, Petitioner asserts that the prosecutor excused Smith, in part, based on her young age, but the prosecutor did not strike a white juror Canup, who was younger than Smith. As Respondent notes, however, Smith's young age was not the only basis for the prosecutor's decision to strike her, and his other reasons are amply supported by the record. As the Supreme Court has noted, "[r]easonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination." *Collins*, 546 U.S. at 341-42.

Here, the state court's adjudication of Petitoner's *Batson* claim was neither

-43-

contrary to nor an unreasonable application of clearly established Supreme Court law, nor was it an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Petitioner's contention that this court should conduct a *de novo* review of the *Batson* claim is simply without merit. The Supreme Court recently reiterated that review under AEDPA is not *de novo* and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter*, 131 S. Ct. at 786 (stating that "[i]f th[e] standard [under AEDPA] is difficult to meet, that is because it was meant to be").

Furthermore, Petitioner contends that he is entitled to relief because the North Carolina Supreme Court failed to discuss a comparative juror analysis in addressing the *Batson* claim. Petitioner points in his brief to instances in which white jurors answered questions similar to those answered by jurors Smith and Stein. Petitioner notes that the prosecution did not strike these white jurors. Petitioner contends that this shows that the State's proferred reasons for challenging Smith and Stein were clearly pretextual and that the North Carolina Supreme Court's adjudication was therefore contrary to or an unreasonable application of *Batson* and its progeny.

Petitioner's claim is without merit, as the state supreme court's failure to discuss a comparative juror analysis is not contrary to any U.S. Supreme Court decision. As the court has already noted, *supra*, even if *Miller-El* had been decided

before Petitioner's conviction became final, *Miller-el* did not impose a new comparative juror analysis requirement to the *Batson* inquiry. Furthermore, Petitioner's contention that the state supreme court's decision was "contrary to federal law because it improperly collapsed *Batson* steps two and three into a single inquiry" is also without merit. The state supreme court properly set forth the three-part test of *Batson* and then applied that test in determining whether the prosecutor peremptorily challenged jurors Smith and Stein based on their race.

Finally, the court notes that, in his brief in support of the PWHC, Petitioner raises two arguments in support of his *Batson* claim that he did not raise on direct appeal to the North Carolina Supreme Court and that he did not raise in his PWHC. In his direct appeal to the North Carolina Supreme Court, Petitioner sought review of the trial court's denial of his *Batson* challenges as to jurors Smith and Stein. Petitioner relied on statistical evidence relating to peremptory strikes against African-American jurors *in his own case*, together with the record of Smith's and Stein's voir dire, to show that the prosecutor's reasons for excusing Smith and Stein were pretextual. (*See* Pet.'s Br. on Direct Appeal, Ex. D to docket no. 24, pp. 110-18.) Similarly, in his PWHC filed in this court on June 13, 2006, Petitioner states that he seeks review of the North Carolina Supreme Court's decision on his *Batson* claim in relation to Smith and Stein on the basis of the same evidence relied on in his direct

appeal to the state supreme court–that is, statistical evidence as to the exercise of peremptory strikes in *his own case*, along with his argument that the record of Smith's and Stein's voir dire show that the prosecutor's reasons for excusing Smith and Stein were pretextual.

In his brief in support of the petition, however, Petitioner now advances arguments that were not made to the North Carolina Supreme Court on his direct appeal. That is, Petitioner now seeks review of the trial court's denial of his *Batson* challenges as to two additional jurors, Morrison and Brown, and he also seeks to proffer statistical evidence of a pattern of race discrimination during jury selection by the Mecklenburg County district attorney's office in cases other than his own. Petitioner relies on statistics relating to peremptory challenges in other cases, and their interpretation by sociologist Mary Rose, whose affidavit he attaches to his supporting brief.

First, as to jurors Morrison and Brown, although Petitioner did identify these jurors in this assignments of error to the North Carolina Supreme Court on direct appeal, he did not argue his *Batson* claims as to these two jurors in his brief before the North Carolina Supreme Court on direct appeal. Rather, in his direct appeal brief, Petitioner sought review of the trial court's rejection of his *Batson* challenges as to jurors Smith and Stein only. Petitioner did not advance an argument in his brief in

Case 3:06-cv-00248-MOC   Document 98   Filed 09/30/11   Page 46 of 49

relation to the prosecutor's excusals of Morrison, Brown, or any other juror.  Because Petitioner did not present these claims to the North Carolina Supreme Court they are unexhausted, and any attempt by Petitioner to exhaust them by filing a motion for appropriate relief would be procedurally barred.  *See* N.C. GEN. STAT. § 15A-1419(a)(2).  Thus, Petitioner is barred from raising these claims in his PWHC.

Petitioner also attempts to proffer evidence to this court that the Mecklenburg County district attorney's office "engaged in a broad pattern of race discrimination during jury selection in other Mecklenburg County murder trials that occurred both before [his] trial and after."  (Docket no. 91, pp. 7-8 n.4.)  Petitioner requests that the court grant him an evidentiary hearing on his newly advanced statistical evidence of peremptory challenges other than in his own case.  The court will deny Petitioner's request for a hearing because he failed to develop the factual basis for his claim in the state court proceedings.[9]  *See* 28 U.S.C. § 2254(e)(2); *see also Cullen v. Pinholster*, 131 S. Ct. 1388, 1399-1400 (2011) (confirming that the court may not consider new evidence in support of a claim adjudicated on the merits in the state court when the evidence was not presented in support of that claim and noting that "[i]t would be

---

[9]  The court notes Petitioner's contention in his Reply brief that the court should allow either an evidentiary hearing or stay the proceedings until conclusion of the second MAR hearing under *Pinholster*.  The court declines to grant either request from Petitioner.  The court will also deny the request for oral argument asserted in Petitioner's brief.

-47-

strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court"). Petitioner contends in his brief that he *did* develop a factual basis for this claim in state court (1) by asserting systematic discrimination in a pre-trial motion, in which he asserts that he "first raised the specter of discrimination," and (2) by filing a successive motion for appropriate relief in state court after filing his PWCH in this court. For the following reasons, the court does not agree.

First, as to Petitioner's contention that he raised the factual basis for the claim in a pre-trial motion, the transcript of hearing on the pre-trial motion shows that at the hearing defense counsel offered no evidence other than expressing his personal belief that the Mecklenburg County district attorney's office had shown a pattern of discrimination against black jurors in previous death penalty cases. Defense counsel requested the trial court to "take whatever steps necessary to prevent [racial discrimination in the exercise of peremptory challenges] from occurring." (Ex. C to docket no. 24, pp. 20-21.) The trial court judge stated that he would withhold ruling on the motion until jury selection, and he advised the prosecutor to give the court notice when the State sought to exercise a peremptory challenge against a minority juror so that the *Batson* issue could be addressed. The court finds that the pre-trial motion and the hearing on the motion did not "factually develop" a claim based on

statistical evidence relating to other cases within the meaning of Section 2254(e)(2).

Next, the fact that Petitioner has filed a second MAR, which is now pending, and in which he has alleged systematic race discrimination by the district attorney's office, does not satisfy the requirement under Section 2254(e)(2) that Petitioner is required to develop his factual predicate in state court or that he must first exhaust his claims in state court. As Petitioner has not met the requirements for an evidentiary hearing under Section 2254(e)(2), the court will deny Petitioner's request for an evidentiary hearing. For the same reason, the court will deny Petitioner's request to expand the record.

## CONCLUSION

For the reasons stated herein, Respondent's motion for summary judgment is **GRANTED** (docket no. 24) and the Petition for Writ of Habeas Corpus is **DENIED** (docket no. 1).

**IT IS SO ORDERED**.

Signed: September 30, 2011

Max O. Cogburn Jr.
United States District Judge

-49-